UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SECURITIES AND EXCHANGE
COMMISSION ,

          Plaintiff,

   v.

3 EAGLES RESEARCH & DEVELOPMENT
LLC, HARRY DEAN PROUDFOOT III,
MATTHEW DALE PROUDFOOT, LAURIE
ANNE VRVILO, and DENNIS ASHLEY
BUKANTIS,

          Defendants.

Case No: 3:12-cv-01289-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, the Securities and Exchange Commission ("SEC"), brought this action against a

gold mining company, 3 Eagles Research & Development LLC ("3 Eagles"), its former owner

and president, Harry Dean Proudfoot III ("Proudfoot"), and two of his adult children, Matthew

Dale Proudfoot ("Matthew Proudfoot") and Laurie Anne Vrvilo ("Vrvilo"),  as well as an

unregistered securities broker, Dennis Ashley Bukantis ("Bukantis").  It alleges that 3 Eagles,

Proudfoot and his children have violated, and aided and abetted violations of, the antifraud and

registration provision of, §§ 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"),

15 USC §§ 77e(a), 77e(c), and 77q(a) (Second and Third Claims), and § 10(b) and Rule 10b-5 of

the Securities Exchange Act of 1934 ("Exchange Act"), 15 USC § 78j(b) (First Claim).  It also

alleges that Proudfoot is also liable as a controlling person of 3 Eagles under § 20(a) of the

Exchange Act, 15 USC § 78t(a), for 3 Eagles's violations of § 10(b) and Rule 10b-5 of the

Exchange Act (First Claim), and that Bukantis violated the broker-dealer registration provisions

of §15(a)(1) of the Exchange Act, 15 USC § 78o(a)(1).  This court has federal question

jurisdiction pursuant to 28 USC § 1331.

On September 12, 2012, this court entered a default judgment against 3 Eagles (docket

#55).  Subsequently, Judge Anna Brown entered final judgments of permanent injunctions

against all individual defendants except Proudfoot.[1]

The SEC has filed a Motion for Summary Judgment (docket #159) to establish liability

on all claims against Proudfoot (First, Second and Third Claims).  Since Proudfoot is

representing himself, this court sent him a Summary Judgment Advice notice on May 24, 2013

(docket #170), and has granted him several extensions of time to respond (dockets #183, #188,

#200).  For the reasons that follow, the court should grant summary judgment in favor of the

SEC.

### STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

---

[1] Judge Anna Brown entered final judgments against Matthew Proudfoot and Vrvilo on March 18, 2013 (dockets #152 & #153), and against Bukantis on June 7, 2013 (docket #178).

only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted).  The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party." *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011) (citations omitted).

## FINDINGS

I.    **Threshold Issues**

A.    **Proudfoot's Request to Stay Proceedings**

In his submission dated December 19, 2013 (docket # 214), Proudfoot requests a stay of these proceedings for 12 months to allow him to save enough money to afford counsel and conduct depositions.[2]  Proudfoot opines that within the next year, the investors in 3 Eagles will begin recouping their investments in the Ohio gold mines which he contends is evidence relevant to this motion.  The SEC opposes a stay, arguing that it would prejudice investors and that Proudfoot has failed to show good cause.

Ruling on a motion to stay falls within a district court's "inherent power to control the disposition of the causes on its docket," but calls for the "exercise of sound discretion." *CMAX, Inc. v. Hall*, 300 F2d 265, 268 (9th Cir 1962).  "Where it is proposed that a pending proceeding

---

[2] In an attempt to justify a one-year stay, Proudfoot claims he was "blocked from my rights to mediation."  On September 9, 2013, this court issued an Order referring the case to mediation (docket #198).  However, on September 13, 2013, the court vacated that Order "based on the recommendation of the Staff Mediator" (docket #199).

be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed." *Id*. "Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay. *Id* (citation omitted).

Staying this proceeding would prejudice the SEC and the investors it seeks to protect. This action was filed in July 2012, and the summary judgment motion has been pending for eight months since May 2013. Adding another 12 months would further delay the SEC's opportunity, if found appropriate, to obtain disgorgement orders on behalf of the existing 3 Eagles investors, and an injunction to avoid harm to other potential investors.

The SEC also cites potential prejudice to the public. "The public has a vital interest in the integrity of public markets," *SEC v. Nicholas*, 569 F Supp2d 1065, 1072 (CD Cal 2008) (citation omitted), and interest in a speedy resolution of the controversy. *Keating v. Office of Thrift Supervision*, 45 F3d 322, 326 (9th Cir 1995). Because of that interest, delaying proceedings may compromise public confidence in the agency's ability to take prompt enforcement action. *Id.* Although this enforcement action has received little media attention, the requested stay would be prejudicial to the SEC's enforcement of federal law and to the allegedly harmed investors.

Proudfoot fails to show how denial of his request would prejudice his defense. He claims that the court has excluded him from performing a "full discovery." Response to Motion for Summary Judgment (docket #203), ¶ 8 ("Response"). On the contrary, Proudfoot has shown no effort to conduct discovery despite available and accessible opportunities to do so. He received

notice of third-party depositions and had an opportunity to attend them either in person or by telephone. Yun Suppl. Decl. (docket #205), ¶¶ 2-3. Although counsel for Matthew Proudfoot and Vrilo attended by telephone, Proudfoot did not attend any deposition other than his own. *Id*, ¶ 3. Proudfoot fails to explain what depositions he would conduct during a one-year stay that did not occur during the discovery period. Moreover, the SEC sent Proudfoot a file containing depositions exhibits marked in this action (*id*, ¶ 4, Ex. 15), which Proudfoot fails to even mention in his submissions.

Proudfoot contends that additional discovery will produce evidence that the 3 Eagles investors have recently begun earning income as a result of new ownership at the Danville mine. Specifically, such discovery may reveal payments to investors and verify the projected royalties advertised to investors. However, as explained below, evidence of the mine's current profitability is irrelevant to the claims against Proudfoot.

Proudfoot also fails to show how his finances would be prejudiced by denying his request. He attests that his financial situation is improving, but does not explain how he will afford an attorney by the end of the year. Even if his assets are increasing because of the "business of Buying and Selling" (Response, ¶ 11), his ability to generate enough income from this new business is speculative. He does not describe the nature of his "business of Buying and Selling" and does not suggest how much income he will earn in one year or how other concurrent legal proceedings will impact that income. As a result, Proudfoot fails to show how a stay would allow him to afford an attorney.

Finally, a stay would frustrate resolution of this matter. Over the course of this action, the court has granted Proudfoot five extensions of filing deadlines. Given the leeway the court

has provided Proudfoot so far, he has had adequate time to develop his defense, and any further postponement would only create delay.

Given that Proudfoot has not sufficiently demonstrated that he will suffer prejudice in the absence of a stay or that extra time will produce discovery relevant to this proceeding, his request for a 12-month stay is denied.

### B.      Evidentiary Objections

In its reply (docket #204), the SEC objects to the admissibility of all evidence submitted by Proudfoot in response to its motion.  For the reasons that follow, those objections are sustained.  "A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F3d 764, 773 (9th Cir 2002) (citations omitted); *see* FRCP 56(c)(4).  "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of [FRCP] 56."  *Block v. City of L.A.*, 253 F3d 410, 418-19 (9th Cir 2001) (citation omitted).  As required by FRCP 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matter stated."

### 1.      Statement of Facts

First, the SEC objects to the "Statement of Facts — The Ohio Project" attached to Proudfoot's Response as lacking foundation.  Given Proudfoot's *pro se* status, the court gives him the benefit of any doubt and is willing to treat his attachment as a declaration.  However, an unsworn declaration must be subscribed as being true under penalty of perjury.  28 USC § 1746. Although Proudfoot signed his Response which references the Statement of Facts (Response, ¶ 12), his signature was not made under penalty of perjury.

Even if not properly submitted as an unsworn declaration, admissibility is not necessary foreclosed for purposes of summary judgment.  The SEC relies on Fifth Circuit precedent in *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F3d 507 (5th Cir 2001), to object to the form of Proudfoot's statement.  The plaintiff's submission in *Okoye* was inadmissible as summary judgment evidence because it was unsworn.  "It is a settled rule in [the Fifth Circuit] that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment.  A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for an affiant's oath if the statement contained therein is made 'under penalty of perjury' and verified as 'true and correct.'"  *Nissho-Iwai Am. Corp. v. Kline*, 845 F2d 1300, 1306 (5th Cir 1988).  Unsworn statements in the Fifth Circuit must substantially conform to either formula to be considered as summary judgment proof.  *Id*.

The Ninth Circuit has not adopted this stringent requirement but instead scrutinizes the admissibility of the substance of the evidence.  "At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F3d 1032, 1036 (9th Cir 2003) (citation omitted).  If the contents of the evidence are within the declarant's personal knowledge such that could be admitted at trial in a variety of ways, the evidence is admissible in considering a motion for summary judgment.  *Id* at 1037.  Thus, even though Fraser's diary would have likely been inadmissible hearsay, the "contents of the diary are mere recitations of events within Fraser's personal knowledge and, depending on the circumstances, could be admitted into evidence" through testimony.  *Id*; *see also Roberts v. Dimension Aviation*, 319 F Supp2d 985, 989 (D Ariz 2004), citing *Fraser*, 342 F3d at 1036 (court considered plaintiff's unsworn letter over

defendant's objection, explaining that the proper focus at summary judgment stage is the content of the evidence, not the form).

However, there is no precedent for excusing *pro se* plaintiffs for noncompliance with the substantive requirements of FRCP 56. Even if evidence is not presented in an admissible form, it must still satisfy the FRCP 56 requirements. *Block*, 253 F3d at 419; *Taylor v. List*, 880 F2d 1040, 1046 n3 (9th Cir 1989) ("To raise such an issue, the statement would have to be made on personal knowledge, not information and belief."). FRCP 56(c)(4) requires that affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant of declarant is competent to testify on the matters stated." Thus, even if this court considers Proudfoot's unsworn declaration, it can only consider those statements made with personal knowledge.

The SEC specifically objects to the following statements in Proudfoot's Statement of Facts alleging the lack of injury among investors in the Ohio Mining Project and recent gold production in the Ohio mines:

1. "I believe the results are being verified by continuing mining activity at the mining site. Dump trucks of raw ore are being transported to Mt. Vernon for processing. According to Dennis Concilla this mining has been proceeding since May, 2013, almost 6 months now."

2. "I am confident that our legal research into the activities and productivity of this mine will verify our previous finding as reported in "The Ohio Project" and will confirm the dates and amounts of payments to the investors. In this case, there will be NO INJURED PARTIES and our reported findings in our publications will be verified."

3. "I believe that what we presented to our investors is being verified, as the new owners are now mining at Brinkhaven and shipping ore to be processed in Mt. Vernon."

The use of the words "I believe,' however, does not automatically render [his] testimony inadmissible.  Rather, the question is whether [his] statements 'lack[] the requisite proof of personal knowledge.'"  *Edwards v. Toys "R" Us*, 527 F Supp2d 1197, 1201 (CD Cal 2007) (last alteration in original), quoting *Slade v. Baca*, 70 F App'x 446, 449 (9th Cir 2003).  In *Block*, the district court admitted an affidavit of the city's administrative analyst at the summary judgment stage.  The Ninth Circuit reversed because the affidavit was not made on personal knowledge and made clear that analyst was not personally involved in any of the disciplinary suspensions at issue.  Instead the statement "relied on information from (unsworn) departmental personnel officers, and the source of these officers' information is unclear."  *Block*, 253 F3d at 419.

Proudfoot bases his statements about the mine's recent productivity on information from his former Director of Internal Affairs and unnamed "Eye witnesses."  Response, ¶¶ 3-4.  According to Proudfoot, the Director of Internal Affairs learned this information from Dennis Concilla, the new owners' attorney.  *Id*, ¶ 3.  However, this information was exchanged when Concilla called the Director of Internal Affairs to request "email addresses of all our investors so he could contact them to let them know the mine will be up and running in 2 to 3 weeks."  *Id.*  The call occurred on May 8, 2013, and Proudfoot provides no facts that mining actually began or is profitable.  Proudfoot's belief that "the new owners are now mining" is not based on personal knowledge or facts that could be admitted at trial through testimony.  At best, Dennis Concilla could testify only that he called the former Director of Internal Affairs to report the owners expected mining to begin in late May of 2013.  Without setting forth specific facts to support Proudfoot's belief, his statements regarding the new mining operation lack personal knowledge.

The statements regarding the lack of injury to investors are completely unsupported.  Conclusory affidavits that fail to set forth specific facts in support of the affiant's theory do not

meet the FRCP 56(c)(4) burden.  *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F2d

730, 738 (9th Cir 1979) (citing FRCP(e) – the prior version of 56(c)(4)); *see also Steel Corp. v.*

*Golden Eagle Ins. Co.*, 121 F3d 496, 502 (9th Cir 1997) ("Conclusory allegations of collusion,

without factual support, are insufficient to defeat summary judgment.").  Because Proudfoot's

statements about investor profits are speculative and not supported by any facts that the mining is

happening or profitable, they are inadmissible.

### 2.    **Impermissible Expert Testimony**

The SEC also objects to Proudfoot's valuation of the gold and silver reserves as

impermissible expert testimony.  That evidence consists of a worksheet attached to the Statement

of Facts valuing the project at over $20 million and the statement:

> We used 3 different concentrators, two testing metallurgists and 4
> to 5 assayers as a double and triple and more checks against their
> results.  We found the results from each of these to fall into the
> same result categories as the others who were working with the
> same ore from the same batches.   This process confirmed the
> results we were obtaining since each concentrator, tester and
> assayer were independent of one another.

Statement of Facts, p. 4.

"Expert opinion is admissible and may defeat summary judgment if it appears the affiant

is competent to give an expert opinion and the factual basis for the opinion is stated in the

affidavit, even though the underlying factual details and reasoning upon which the opinion is

based are not." *Bulthuis v. Rexall Corp.*, 789 F2d 1315, 1318 (9th Cir 1985).  Proudfoot is not

competent to provide expert testimony about the quality and value of the ore.  He claims to rely

on assays and analyses made by experts, but he does not submit their first-hand opinions.  Thus,

the assays and the $20 million valuation are inadmissible expert testimony.

///

///

10 – FINDINGS AND RECOMMENDATION

II.    **Summary Judgment Motion**

A.    **Undisputed Facts**

In April 2008, Proudfoot founded 3 Eagles as a Nevada corporation with headquarters in Tigard, Oregon.  Complaint, ¶ 9; Amended Answer (docket # 158), ¶ 9.  He remained its President and sole owner until December 2011.  Complaint, ¶ 10; Amended Answer, ¶ 10.

In September 2009, 3 Eagles began investigating a potential gold mining project – "The Ohio Project."  Ellis Depo., pp. 12, 15.[3]  On September 25, 2009, and then again in October 2009, Proudfoot toured gravel mining sites in Danville and Belleville, Ohio, operated by United Aggregates, a company owned by Jeffrey and John Ellis, which was mining sand and gravel at both sites.  *Id*, pp. 33-35.  The parties did not exchange or sign any agreements during Proudfoot's trips, and United Aggregates did not hear from Proudfoot again for over six months.  *Id*, pp. 37-38, 41, 56-58.  On September 25, 2009, Proudfoot held a dinner meeting with potential investors in Canton, Ohio.  Bukantis Decl., ¶ 6.  The following evening he met with more potential investors for lunch in Chicago, Illinois.  *Id*, ¶ 7.  Two individuals invested in the Ohio Project following these meetings.  *Id*.

In December 2009, Proudfoot met with a securities attorney, Conrad C. Lysiak, to discuss raising capital for the Ohio Project.  Lysiak Depo., pp. 14-16.  Lysiak advised Proudfoot to rely on the Regulation 506 exemption in raising private capital.  *Id*, p. 35.  As required for 3 Eagles to perfect the Regulation 506 exemption, Lysiak filed a Form D with the SEC on April 15, 2010, at which time he believed 3 Eagles had not yet sold securities.  *Id*, pp. 17-18, 33-34.

---

[3] The parties have submitted documents with various attachments, including testimony at hearings before the Securities and Exchange Commission and depositions taken in this case and in a related case in another court. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

From the fall of 2009 to the end of January 2010, 3 Eagles sent a pamphlet called "Ohio Project Notes" to potential investors describing estimated returns from the mining project. Bukantis Decl., ¶ 9 & Ex. B.  In February 2010, 3 Eagles began distributing a PowerPoint presentation titled "An Investment for the 21st Century" to solicit investments.  Yun Decl. (docket #161), Ex. 99; Proudfoot Depo., pp. 90-91.  In his role as President, Proudfoot was responsible for the content of this PowerPoint presentation.  Proudfoot Depo., p. 90.  The presentation described the mining project as encompassing two project sites and covering 300 acres.  Yun Decl., Ex. 99, p. 19.  It also represented that 3 Eagles, together with "RMS Ross Corporation, and United Precast, Inc. have spent the past six years developing a mining exploration and production company."  *Id*, p. 2.  It described Jim and Gloria Adams, part of the company's technical staff, as "Ohio geological expert miners."  *Id*, p. 5.  Finally, the PowerPoint promised that investors would receive up to 10% of the gross revenue from the mining operation.  *Id*, p. 19.  The presentation did not disclose that the State of Oregon had issued Proudfoot a Cease-and-Desist Order in 2003 for selling unregistered securities and for making material misstatements and omissions in connection with those sales.  *Id*, Ex. 63, pp. 20-23.

Proudfoot also approved disbursement of investor funds.  Proudfoot Testimony (docket #161-3), pp. 307-08.  From September 2009 to October 2011, 3 Eagles raised approximately $2.727 million from investors through the sale of membership or royalty units in its proposed gold mining project.  Yun Decl., Ex. 1, p. 5, & Ex. 25.  The PowerPoint stated that Phase I expenses for the Ohio Project would total $3.2 million with 80% for drilling, testing, machine acquisition, and operating expenses and 20% for pre-Phrase I operating expenses.  *Id*, Ex. 99, pp. 20-21.  Commissions, bonuses, and operating costs would not account for more than $700,000 of the initial expenses.  *Id.*  However from September 2009 to October 2011, Proudfoot

and his family members received over $1.1 million in personal loans from 3 Eagles. Proudfoot

Depo., p. 131. According to 3 Eagles's accounting, the remaining investor funds were used for

travel, meals and entertainment, automobile expenses, and legal fees. Yun Decl., Ex. 26.

3 Eagles did not use any funds to purchase equipment or pay for mining operations. *Id.*

Not until March 9, 2010, did 3 Eagles sent a proposed mineral rights lease to United

Aggregates for the 206-acre Danville Site.[4]  *Id*, Ex. 39. On May 22, 2010, the owner of the

Danville site signed the lease, effective March 26, 2010, giving 3 Eagles the right to extract

minerals from the gravel and sand mined by United Aggregates. *Id*, Ex. 40; Ellis Depo., p. 64.

3 Eagles did not obtain a lease for the Belleville site which covered approximately 90 acres.

Ellis Depo., pp. 62, 64. Again, the negotiations subsided. Rose Depo., p. 25.

More than a year later, on August 10, 2011, United Aggregates and 3 Eagles entered a

Development Agreement to allow 3 Eagles to conduct gold mining operations at the Danville

site. Yun Decl., Ex. 49. Under this contract, United Aggregates would extract raw aggregate

and deliver it to the Danville Site where 3 Eagles would "process the aggregate for black sand,

heavy metal, or mineral extraction." *Id*, ¶¶ 4-5. The Development Agreement also allowed

3 Eagles to receive up to 12.5% of the "gross revenue in order for 3 Eagles to meet its

obligations to Royalty Interest Holders." *Id*, ¶ 7(c)(i).

On September 9, 2011, Lysiak filed another Form D after discovering information that

3 Eagles had begun to sell to investors. Lysiak Depo., pp. 37-38. In September 2011, Lysiak

completed the Private Placement Memorandum for a private offering of securities in the Ohio

Project. *Id*, pp. 105-106. The Memorandum was intended for accredited investors only because

it did not include audited financial statements or other information required for a Form S-1

---

[4] The site is also referred to as the Brinkhaven Site because it was owned by Brinkhaven Exploration LLC. Ellis
Depo., pp. 61-62.

Registration Statement.  *Id*, pp. 54, 66-68, 102.  In October 2011, Lysiak terminated his

representation of 3 Eagles after learning that it was selling securities to unaccredited investors.

*Id*, pp. 20, 103.

3 Eagles neither initiated mining operations nor even installed equipment at the Danville

Site.  Ellis Depo., pp. 59-60, 100, 105.  On August 15, 2012, 3 Eagles and United Aggregates

terminated the mining lease and Development Agreement soon after 3 Eagles's dissolution.  Yun

Decl., Ex. 107.  A new company, Resource Recovery of Ohio, set up processing equipment at the

Danville Site in March 2013.  Ellis Depo., p. 100.  As of March 19, 2013, gold extraction was

anticipated to begin the following week.  *Id.*

      **B.**      **<u>Registration Provisions</u>**

Sections 5(a) and 5(c) of the Securities Act prohibit any person from directly or indirectly

selling a security through interstate commerce "[u]nless a registration statement is in effect as to

[such] security" or from offering to sell a security "unless a registration statement has been filed

as to such security."  15 USC §§ 77e(a) & 77e(c).  The SEC establishes a violation of the

registration provisions by showing:  "(1) no registration statement was in effect as to the

securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the

sale or offer was made through interstate commerce."  *SEC v. CMKM Diamonds, Inc.*, 729 F3d

1248, 1255 (9th Cir 2013) (citations omitted).

The 3 Eagles royalty units constitute "securities" under federal law.  The term "security"

includes any "certificate of deposit for a security, fractional undivided interest in oil, gas, or

other mineral rights."  15 USC § 77b(a)(1).  3 Eagles offered an investment in the Ohio Project

through royalty units (also called "membership units") which represent the type of securities

Congress intended to include in § 77b(a)(1).  *See Ballard & Cordell Corp. v. Zoller &*

*Danneberg Exploration, Ltd.*, 544 F2d 1059, 1064 (10th Cir 1976) (citations omitted) ("it was the manifest Congressional intent to exclude from the scope of the Act isolated sales or assignments of oil and gas leases or fractional parts thereof to specific persons, and to specifically include as securities only that form of splitting up of mineral interests which had been most utilized for speculative purposes").  More importantly, 3 Eagles admitted that it failed to register its security offerings by stating in the March 29, 2012 rescission offer that: "THE COMPANY HAS NEITHER REGISTERED SECURITIES WITH NOR OBTAINED APPROVAL OR DISAPPROVAL OF ITS SECURITIES BY THE SECURITIES AND EXCHANGE COMMITTEE."  Yun Decl., Ex. 1, p. 2.

Proudfoot does not challenge any of registration elements or claim entitlement to an exemption.  The Form Subscription Agreement, which served as the investor contracts, shows that 3 Eagles intended to qualify for the Regulation 506 exemption.  Yun Decl., Ex. 44, p. 8 ("The Membership Units are being sold pursuant to the exemption from registration provided for in Regulation 506 of the Securities Act of 1933.").  To qualify for the Regulation 506 exemption, the offering had to either include "no more than . . . 35 purchasers of securities from the issuer in any offering under this section" under 17 CFR § 230.506(b)(2)(i) or all accredited purchasers under 17 CFR § 230.506(c)(2)(i).

3 Eagles failed to meet the requirements of that exemption for two reasons.  First, its investor pool included over 60 unaccredited investors for a single offering.  Marlow Decl. (docket #8), ¶ 60 & Ex. 53; Lysiak Depo., p. 21.  Second, the "Offering Memorandum did not have all the information that was required or would be included in a Form S-1 Registration Statement" as is required to sell to unaccredited investors.  Lysiak Depo., pp. 13, 102-104.

///

C.    __Antifraud Provisions__

Section 10(b) of the Exchange Act prohibits the use "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of the SEC's rules and regulations.  15 USC § 78j(b).  Section 17(a) of the Securities Act makes it unlawful directly or indirectly to:

> (1) employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 USC § 77q(a).

The SEC argues Proudfoot individually violated these provisions with a series of misrepresentations and omissions made when selling royalty interests in 3 Eagles.  Proudfoot fails to meet his burden at summary judgment.  Although Proudfoot submits some admissible statements, they either are irrelevant or fail to contradict the SEC's evidence.  Evidence of potential investor profits, even if admissible, is irrelevant to defending accusations of fraud.  The SEC is not required to prove injury to investors to establish violations of §10(b).  *SEC v. Rind*, 991 F2d 1486, 1490 (9th Cir 1993) ("Indeed, a district court may grant the Commission's request for disgorgement even where no injured investors can be identified."); *see SEC v. Rana Research, Inc*, 8 F3d 1358, 1363 (9th Cir 1993) ("Conduct may be fraudulent and so violate Rule 10b–5, exposing the perpetrator to liability, but may not result in the types of harm necessary to subject the actor to liability to a particular private plaintiff.").

The only element of fraud contested by Proudfoot is the scienter requirement.  Violations of § 10(b) and Rule 10b-5 of the Exchange Act and § 17(a)(1) of the Securities Act require proof

of scienter which is "an intent on the part of the defendant to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 US 680, 686 (1980); *Hollinger v. Titan Capital Corp.*, 914 F2d 1564, 1568 (9th Cir 1990), citing *Ernst & Ernst v. Hochfelder*, 425 US 185, 193 (1976). "[R]ecklessness may satisfy the element of scienter in a civil action for damages under § 10(b)." *Hollinger*, 914 F2d at 1568-69. On the other hand, "[v]iolations of Sections 17(a)(2) and (3) require a showing of negligence." *SEC v. Dain Rauscher, Inc.*, 254 F3d 852, 856 (9th Cir 2001) (citation omitted).

Proudfoot states that "[a]ll information given to our investors was always very conservative. . . . We have tried to be truthful and honest with every investor about the project. The intention was never to misrepresent the project in any way." Statement of Facts, p. 1. Scienter is a subjective inquiry. *Gebhart v. SEC*, 595 F3d 1034, 1042 (9th Cir 2010). "Thus, although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Id* (citation omitted).

Even though Proudfoot's actual intent are relevant to the analysis, he fails to create a genuine issue as to whether he knowingly made false representations to investors or at least acted recklessly. Proudfoot authorized the February 2010 PowerPoint presentation to reflect that 80% of the Phase 1 investments would be used for drilling, testing, and equipment purchases. Yun Decl., Ex. 99, p. 19; Proudfoot Depo., pp. 121, 130. But at that time, Proudfoot and his family were taking personal loans from 3 Eagles that exceeded the 80% level and were funded entirely by investments. Yun Decl., Ex. 25; Proudfoot Depo., pp. 129, 131-32. Those personal loans eventually depleted the capital raised from investors. Yun Decl., Ex. 25. Also at that time, Proudfoot had authorized use of investor funds to repay investors in his prior business ventures. Vrvilo Testimony (docket #161-3), p. 203.

Furthermore, Proudfoot characterized the Ohio Project as covering 300 acres when he could only mine 204 acres.  Yun Decl., Exs. 43 & 96.  Proudfoot knew that he could only mine land that he leased.  Proudfoot Depo., p. 26.  Yet he claimed the Project included the Belleville mine when his lease only included the 204-acre Danville site.  *Id*, pp. 45-46.  Proudfoot also knew that 3 Eagles could not pay gross revenues to investors until it had completed a Development Agreement with United Aggregates.  *Id.*, pp. 51, 53-55, 159-60.  This Agreement was executed on August 10, 2010.  Yun Decl., Ex. 49.  Yet before August 10, 2010, the PowerPoint presentation promised that royalty holders would receive 10% of gross revenues.  *Id*, Ex. 44, p. 51, & Ex. 99, p. 21.

Similarly, Proudfoot acknowledges that the PowerPoint falsely stated that United Precast was a 3 Eagles joint venture partner and that the parties had been developing the project together for six years.  *Id*, Ex. 99, p. 2; Proudfoot Depo., p. 92; Ellis Depo., pp. 77-78; Rose Depo., p. 27.  Likewise, because Jim Adams was only an "amateur," Proudfoot admits the PowerPoint falsely claimed the 3 Eagles staff included an expert geologist.  Yun Decl., Ex. 99, p. 4; Proudfoot Testimony, p. 123.

Finally, Proudfoot failed to disclose to investors his history of securities violations.  Daniel Proudfoot Depo. (docket #161-5), pp. 139-141.  Proudfoot was the subject of a 2003 Cease-and-Desist Order by the State of Oregon's securities regulators for selling unregistered securities and for making material misstatements and omissions in connection with the sale of securities.  Yun Decl., Ex. 63, pp. 20-23.  Yet, this information did not appear in any investor information.

///

///

D.     **Control Person Liability**

In addition to Proudfoot's personal violations, the SEC seeks summary judgment against

him as a control person based on violations of § 10(b)9 and Rule 10b-5 of the Exchange Act

committed by 3 Eagles.  A "control person" is defined by § 20(a) of the Exchange Act as:

> Every person who, directly or indirectly, controls any person liable under
> any provision of [the Exchange Act] or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the same
> extent as such controlled person to any person whom such controlled
> person is liable, unless the controlling person acted in good faith and did
> not directly or indirectly induce the act or acts constituting the violation or
> cause of action.

15 USC § 78t(a).

"In order to prove a prima facie case under § 20(a), plaintiff must prove:  (1) a primary

violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or

control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F3d 1057, 1065 (9th Cir

2000) (citation omitted).  "To establish the liability of a controlling person, the plaintiff does not

have the burden of establishing that person's scienter distinct from the controlled corporation's

scienter." *Arthur Children's Trust v. Keim*, 994 F2d 1390, 1398 (9th Cir 1993).  "But a defendant

who is a controlling person of an issuer with scienter may assert a good faith defense by proving

the absence of scienter and a failure to directly or indirectly induce the violations at issue."

*Howard*, 228 F3d at 1065 (citations and internal quotation omitted).

First, Proudfoot does not dispute that 3 Eagles violated § 10(b)9 with the same

misrepresentations and omissions that make up his personal violations.  The PowerPoint

presentation and Ohio Project Notes bore the 3 Eagles logo.  Second, Proudfoot admitted that he

was directly or indirectly a control person of 3 Eagles for purposes of § 20(a) during the period

of April 2008 to December 14, 2011.  Complaint, ¶ 59; Amended Answer, ¶ 59.  Moreover,

"[t]he scienter of a corporation can be imputed from that of its officers." *SEC v. Platforms Wireless Int'l Corp.*, 559 F Supp2d 1091, 1096 (SD Cal 2008), citing *SEC v. Manor Nursing Centers, Inc.*, 458 F2d 1082, 1089 n3 (2nd Cir 1972).  Therefore, he may also be held liable as a control person.  Proudfoot cannot avail himself of a good faith defense because he failed to prove the absence of scienter or a failure to induce the violations, as explained above.

## RECOMMENDATION

For the reasons stated, the SEC's Motion for Summary Judgment (docket #159) should be GRANTED.

## SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Tuesday, February 18, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED January 31, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

20 – FINDINGS AND RECOMMENDATION